IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 10, 2023

## STATE OF TENNESSEE v. TIMOTHY HUTCHERSON

**Appeal from the Circuit Court for Montgomery County**
**No. CC-18-CR-342 William R. Goodman, III, Judge**

_____

### No. M2023-00116-CCA-R3-CD

_____

The Defendant, Timothy Hutcherson, was convicted of second degree murder, attempted second degree murder, two counts of aggravated assault, two counts of possession of a firearm during the commission of a dangerous felony, and reckless endangerment and received an effective sentence of twenty-three years in confinement. On appeal, he contends that the evidence is insufficient to support his conviction of second degree murder, that the trial court erred by failing to suppress his statement to police, and that the trial court erred by allowing the jury to hear about his gang affiliation in violation of Tennessee Rule of Evidence 404(b). Based on our review, we affirm the judgments of the trial court but remand the case to the trial court for correction of the judgment in count nine.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed, Case Remanded**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and KYLE A. HIXSON, JJ., joined.

Terria D. Blunt (on appeal and at motion for new trial hearing) and Jacob W. Fendley (at trial), Clarksville, Tennessee, for the appellant, Timothy Hutcherson.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Robert J. Nash, District Attorney General; and R. Allan Thompson, J. Lee Willoughby, and Kayla McBride, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# FACTS

In April 2018, the Montgomery County Grand Jury returned a nine-count indictment, charging the Defendant with the second degree murder of Devonte Wilkerson in count one; aggravated assault resulting in the death of Mr. Wilkerson in count two; the attempted second degree murder of M.P. in count three;[1] the aggravated assault of M.P. by use of a deadly weapon in count four; possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., the attempted second degree murder of M.P., in count five; the attempted second degree murder of Dashia Gross in count six; the aggravated assault of Ms. Gross by use of a deadly weapon in count seven; possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., the attempted second degree murder of Ms. Gross, in count eight; and reckless endangerment by discharging a firearm into an occupied habitation in count nine. The Defendant's trial began on September 21, 2020. Prior to jury selection, the State dismissed count two, aggravated assault resulting in the death of Mr. Wilkerson.

At trial, Officer Justin Long of the Clarksville Police Department ("CPD") testified that about 11:30 p.m. on November 11, 2017, he responded to a shooting at an apartment on Beech Street. When he arrived, he went to the rear of the apartment and saw that a window was "busted out." An African-American man was lying on his back outside the apartment, and Officer David Hauser was assisting the man, who had injuries to his lower torso. The man was talking but eventually lost consciousness. Officer Long set up crime scene tape to keep people from walking through the area and found "several" shell casings in the parking lot in front of the apartment.

On cross-examination, Officer Long testified that the area was dark. The injured man was lying in front of the window and said he had "come through the window." A female at the scene also had been shot.

Officer David Hauser of the CPD testified that he responded to the shooting and was one of the first officers to arrive at the apartment. The scene was "[v]ery chaotic" with people running through the apartment complex. A party had been occurring in the apartment at the time of the shooting, and ten to fifteen people were still present. Devonte Wilkerson was lying on the ground behind the apartment, which was on the ground floor of the apartment building. The apartment did not have a back door, so people were jumping out a back window.

---

[1] To protect the identity of anyone who was a minor at the time of the offenses, we will refer to them by their initials.

Officer Hauser testified that he was the first officer to make contact with Mr. Wilkerson and that Mr. Wilkerson was conscious but "fading pretty fast." Mr. Wilkerson had one gunshot wound in his abdomen and another wound in his buttock, directly behind the first wound. Officer Hauser applied gauze and pressure to Mr. Wilkerson's abdomen until medical personnel arrived and took over his care.

On cross-examination, Officer Hauser testified that he saw ten to fifteen people exit the apartment window. The window was open, not broken, and Officer Hauser did not remember seeing any broken glass. A second gunshot victim also was present.

Dashia Gross testified that she knew the Defendant because they used to "hang[] out" on the same street. On November 11, 2017, Ms. Gross was living in an apartment on Beech Street and hosted a party for her friend, whom she knew as "Laylay." Laylay and the Defendant were friends, but Ms. Gross did not invite the Defendant to the party.

Ms. Gross testified that the party started at 7:00 or 8:00 p.m. About twenty people attended the party, and five or six of them were members of the "Deuce" gang, also known as the "Hoovers." Ms. Gross and Laylay were not gang members, but Ms. Gross's brother, who attended the party, was a member of the Hoovers. No one at the party had a gun. Ms. Gross knew the Defendant to associate with the "Pirus" and "Bloods," but she did not know if he was a gang member. The Deuces and Hoovers did not get along with the Pirus and Bloods.

Ms. Gross testified that at some point, the police arrived at her apartment due to complaints about loud music and people being outside. A police officer told Ms. Gross to keep her guests inside her apartment, so Ms. Gross made sure everyone stayed inside the residence. About thirty minutes later, Ms. Gross saw Laylay texting someone on Laylay's cellular telephone. Laylay then went out the front door, so Ms. Gross went to the front door and looked outside. She saw the Defendant getting out of his car and saw Laylay hugging him. The Defendant had backed his car into a parking space and had a gun in his hand. The Defendant did not say anything to Ms. Gross. Ms. Gross said that the Defendant "was just looking like he was coming over there to do something" and that she told him, "'Don't come over here with all that.'"

Ms. Gross testified that Laylay moved away from the Defendant and that the Defendant raised his hand and pointed the gun. Ms. Gross began to slam the door and heard gunshots. Everyone in the apartment started running and exiting a window in the rear of the apartment, but Ms. Gross hid in a closet. She later heard M.P. yelling and saw M.P. lying in the hallway. Ms. Gross also saw Mr. Wilkerson, who had been on the couch before the shooting, lying on the ground behind the apartment.

Ms. Gross testified that prior to the shooting, she and her guests thought they heard someone knock on the front door. Ms. Gross said the Defendant could not have been the person who knocked because he was just getting out of his car when she followed Laylay to the door and looked outside. She said she was not positive she heard someone knock on the door.

On cross-examination, Ms. Gross testified that she was eighteen years old at the time of the shooting and that people were drinking alcohol at the party. She said that she did not remember if she consumed alcohol and that she did not know if marijuana or other drugs were present. She acknowledged giving a statement to police in which she said that she heard someone knock on the door and that she answered the door. She also acknowledged saying in her statement that she saw the Defendant and a second man getting out of the Defendant's car and that she heard two guns firing during the shooting.

Ms. Gross testified that the second man had "stuff," possibly a shirt, around his face. She acknowledged that she later misidentified the second man. The apartment had two front doors, a main door and a screen door, and the couch was next to the doors. Ms. Gross said the shooting started before she was able to shut the main door completely and that she heard multiple gunshots. It was dark outside, but streetlights and building lights were on in the apartment complex. Ms. Gross acknowledged that she did not see the Defendant fire his gun but said that he was the only person with a gun and that she saw him point the weapon. She acknowledged that gang members were in her apartment but said that she did not know if they wanted to harm the Defendant.

Dr. Emily Dennison, a forensic pathologist with the medical examiner's office in Nashville, testified as an expert in forensic pathology that she conducted Mr. Wilkerson's autopsy and that he was shot twice. One bullet entered his left buttock, traveled through his bladder, severed an iliac vessel, and exited the right side of his groin. The severed vessel caused extreme blood loss, which resulted in his death. The second bullet entered the back of Mr. Wilkerson's left leg, and Dr. Dennison recovered the bullet in that area. According to Mr. Wilkerson's autopsy, his cause of death was the gunshot wounds, and his manner of death was homicide.

A.B., who was seventeen years old at the time of the shooting, testified that she attended the party. A.B. knew Ms. Gross and Laylay because the three of them went to high school together. A.B. knew the Defendant through Laylay, but A.B. and the Defendant were not friends. About twenty people attended the party, and approximately six of them were members of the Hoovers. None of the gang members were wearing "colors" at the party.

A.B. testified that at some point, she heard a knock on the front door. She and Ms. Gross went to the door, Ms. Gross opened the door, and they looked outside. A.B. saw the Defendant standing beside his car, which was backed into a parking space, and the Defendant had "an angry look on his face." Ms. Gross said something to the Defendant, and A.B. saw a gun in the Defendant's hand. She ran, heard gunshots, and jumped out the back window.

A.B. testified that the Defendant was affiliated with the Pirus or Bloods, which were represented by the color red. The Defendant was wearing "a red flag" around his head when he arrived at the apartment.

On cross-examination, A.B. acknowledged that she did not know the Defendant well and had never spoken with him. She also acknowledged that people were "coming and going" at the party and that she was not paying attention to their movements. Adults and minors attended the party, and they were drinking alcohol and smoking marijuana. A.B. said the Defendant knew members of the Hoovers would be at the party. Defense counsel asked how the Defendant, and A.B. answered, "I don't [know] how he knew, but he knew they were there."

A.B. testified that after Ms. Gross opened the door, Laylay ran outside and hugged the Defendant. The Defendant was already outside of his car and was standing at the apartment door. A.B. did not know if the Defendant was the person who knocked on the door, but he was the only person she saw standing there. Ms. Gross yelled at the Defendant and told him to leave, but she did not tell him that he may get shot or that people at the party wanted his "head." A.B. did not see who fired the gun and did not hear two guns firing.

On redirect-examination, A.B. testified that she did not see anyone with a gun at the party. A male arrived with the Defendant, but A.B. did not see his face because he was not turned toward the apartment door. A.B. said the male was wearing all-black clothing and a hoodie with the hood pulled up over his head.

M.P. testified that she was fourteen years old at the time of the party and "knew of" Laylay. She went to the party with a friend, and her mother did not know she was there. M.P. played "drinking games" in a back room of the apartment and consumed alcohol. She then went to the front room, which was "full" of people. M.P. stated that she was intoxicated and that she "somewhat knew what was going on but not fully." She remembered that she was standing up and that "everyone started freaking out." M.P. did not hear any gunshots and did not realize she had been shot. She awoke on the floor and heard people screaming and crying.

M.P. testified that an ambulance transported her to an emergency room and that she had seven bullet wounds in her legs. One of her legs was broken, and she underwent surgery the next day. M.P. said that at the time of trial, she still could not walk distances or run and that she suffered from post-traumatic stress disorder and anxiety.

On cross-examination, M.P. testified that she did not know anyone at the party was a gang member or that the shooting was gang-related. The music was loud, the lights in the apartment were turned off, and M.P. did not hear a knock on the door or gunshots. She said she thought she was shot six times.

Detective Brittany Feinberg of the CPD testified that she responded to the scene to photograph evidence. Seven cartridge cases were in the parking lot in front of the apartment, and the police found two bullets inside the apartment.

Detective Scott Beaubien of the CPD testified that he assisted with evidence collection and helped determine the trajectory of the bullets. Seven bullet holes were in the screen door, and six bullets holes were in the main door. Both of the doors were metal. Some of the bullets struck a couch, and one bullet struck a refrigerator. All of the bullets were fired from outside the apartment.

Special Agent Alex Brodhag of the Tennessee Bureau of Investigation ("TBI") Crime Laboratory testified as an expert in firearms analysis that he microscopically examined the seven cartridge cases found in front of the apartment. He concluded that all of them were fired from "the same nine-millimeter luger caliber weapon."

On the morning of the third day of trial, the State advised the trial court that it had been unable to locate J.F., the male who arrived at the apartment with the Defendant, for trial. The State requested that the trial court declare J.F. unavailable so that his testimony from the Defendant's preliminary hearing could be read into evidence. The trial court held a jury-out hearing in which two police officers testified. After the hearing, the trial court found that J.F. was an unavailable witness and ruled that a court employee could read his preliminary hearing testimony to the jury. Just prior to the court employee's reading the testimony, defense counsel received a text message, advising defense counsel that J.F. was on his way to court. The State and defense counsel agreed that the court employee should proceed with reading J.F.'s preliminary testimony to the jury.

At the Defendant's preliminary hearing, J.F. testified that on the night of November 11, 2017, he telephoned the Defendant and asked for a ride to J.F.'s mother's house. The Defendant picked up J.F. but instead drove to an apartment on Beech Street. J.F. did not know that the Defendant was going to drive to Beech Street or that the Defendant had a gun. A female came out of the apartment, hugged the Defendant, and returned to the party.

- 6 -

The Defendant got out of the car and shot at the apartment door. The Defendant told J.F. that "[i]t just had to happen" and drove J.F. to J.F.'s mother's house. On cross-examination, J.F. testified that he was intoxicated on the night of the shooting and that he did not know how many shots the Defendant fired at the door.

Detective Michael Ulrey of the CPD testified that he was the lead investigator in the case, that he went to the scene, and that witness accounts and the physical evidence indicated one shooter and one gun. Detective Ulrey concluded that two gangs were involved: the Five-Deuce Hoovers or Crips, whose colors were orange and blue, and the Tree Top Piru Bloods, whose color was red. Detective Ulrey obtained the clothing Mr. Wilkerson was wearing at the time of the shooting. The clothing was not orange or blue.

Detective Ulrey testified that he identified the Defendant as a suspect and that the Defendant eventually turned himself in to police. The Defendant was arraigned before Detective Ulrey was able to speak with him. However, the Defendant's mother later "reached out" to Detective Ulrey and informed him that the Defendant wanted to talk with him. Detective Ulrey had the Defendant's mother confirm that the Defendant wanted to meet with him and then had the Defendant brought to his office. Detective Ulrey interviewed the Defendant, and the State played the recorded interview for the jury.

Detective Ulrey testified that during the Defendant's interview, the Defendant confirmed that he backed into a parking space, that he was known to be a Piru, and that "strife" existed between the Pirus and Hoovers. The Defendant claimed that Ms. Gross's brother, who was a member of the Hoovers, "mean mouthed" him on the night of the shooting and that he thought Ms. Gross's brother was at the party. The Defendant gave Detective Ulrey two versions of the shooting. First, the Defendant claimed that a Hoover shot at him eight times, that he jumped out of the way, and that the bullets struck the apartment door. In the second version, the Defendant claimed that a Hoover tried to pull a gun on him and that he shot at the Hoover in self-defense, striking the apartment door. The Defendant denied having a gun in his first version but admitted having a gun in his second version. Detective Ulrey said he recently had obtained a recorded telephone call in which the Defendant gave a third version of the shooting. In the third version, the Defendant claimed that as he was leaving the apartment, J.F. said, "'Look out.'" The Defendant said he turned around and fired randomly at the door but did not say another person physically threatened him.

Detective Ulrey testified that according to witnesses, the Defendant was driving a white car. However, the Defendant said in his interview that he was driving a red car. The police later found a red car. Bullet holes were in the red car, but the police determined "fairly quickly" that the holes were too old to be related to the shooting on Beech Street.

On cross-examination, Detective Ulrey acknowledged that he also interviewed J.F. after the shooting. Detective Ulrey told J.F. that J.F. was going to be either a witness or a defendant. He also told J.F. that J.F. was a "horrible liar" and that J.F. could go to jail for lying. Detective Ulrey acknowledged that Beech Street was "Crip territory" and that a knock on the door prior to the shooting could have meant someone other than the Defendant was outside the apartment. Detective Ulrey acknowledged that J.F. wore "all red" clothing to the Defendant's preliminary hearing.

The State called J.F. to the stand. The State requested that the trial court designate him a hostile witness, and the trial court did so. J.F. acknowledged wearing all-red clothing to the Defendant's preliminary hearing but denied being a gang member. He said that he met the Defendant about two months before the shooting and that he knew the Defendant "from around the neighborhood." On the night of November 11, 2017, J.F. was intoxicated. The Defendant was supposed to drive J.F. to J.F.'s mother's house. Instead, the Defendant said he had to "go to his girlfriend's right quick" to get a bottle of liquor and drove to Beech Street. When the Defendant and J.F. arrived at the apartment complex, the Defendant backed into a parking space. J.F. said that he did not notice the Defendant had a gun until they were leaving and that the Defendant did not shoot at the apartment.

At that point, the State had J.F. review his preliminary hearing testimony to refresh his recollection. J.F. acknowledged testifying at the hearing that the Defendant possessed a gun when the Defendant got out of the car and that the Defendant shot at the apartment door. The State also questioned J.F. about his interview with Detective Ulrey and played a portion of the recorded interview. J.F. acknowledged telling Detective Ulrey that the Defendant shot at the apartment and that no one was outside the apartment at the time of the shooting. J.F. testified that he lied to Detective Ulrey and denied rehearsing his testimony with the Defendant.

On cross-examination, J.F. testified that he and the Defendant arrived at the apartment complex in a burgundy car and that people were standing outside Ms. Gross's apartment. Ms. Gross came to the apartment door and yelled something to the Defendant. Females went inside the apartment, and Ms. Gross slammed the door. Someone remained outside by the door, and J.F. heard gunshots. J.F. said that he did not see what happened but that someone shot at him and the Defendant. The Defendant seemed afraid.

The State recalled Detective Ulrey to the stand. Detective Ulrey testified that J.F. claimed during his interview that no one was outside the apartment at the time of the shooting. Witnesses reported seeing a white car at the scene, but the police never found a white car. At the conclusion of Detective Ulrey's testimony, the State rested its case.

The Defendant testified that he went to the ninth grade in school and that he was eighteen years old in November 2017. On the night of November 11, he picked up J.F. in a red car, and they went to a friend's house. The Defendant received a telephone call from Laylay, and she told him to "pull up" to the party. The Defendant said that he went to the apartment to get a bottle of liquor from Laylay and that he did not know Hoovers were there.

The Defendant testified that when he and J.F. arrived at Ms. Gross's apartment, he backed the car into a parking space. He said he always backed into parking spaces because it was "really easier" to leave. The Defendant had a gun in his waistband for protection because people thought he was a gang member. Laylay came outside, the Defendant got out of the car, and Laylay hugged him. They talked briefly, and Laylay told him that he needed to leave because people in the apartment had guns and wanted to do "something" to him. The Defendant was not scared but decided to leave. The lights inside the apartment were off, and the Defendant could not see the people inside. Ms. Gross came to the door and told him, "'You need to leave. You ought to know my people don't like you.'" The Defendant heard male voices, Ms. Gross slammed the door, and the Defendant "saw someone out of the corner of [his] eye." He said that someone was "creeping up" on him, that he feared for his life, and that he "just shot." The Defendant did not aim the gun and was just trying to protect himself and J.F. He said that as they were leaving the apartment complex, someone shot at them.

The Defendant testified that he did not go to the apartment to shoot rival gang members and that he did not intend to harm anyone. The Defendant had borrowed the gun from J.F., and the Defendant returned the gun to J.F. after the shooting. The Defendant did not think bullets could go through a metal door and did not think he could have killed anyone. When he learned someone died in the shooting, he turned himself in to police.

The Defendant testified that his mother talked with Detective Ulrey. The Defendant's mother told the Defendant, "'[H]e wants to talk to you, that's if you want to.'" The Defendant told his mother, "'Okay, I'll talk to him. Can you call him for me?'" The Defendant said he lied to Detective Ulrey a couple of times. However, the Defendant was "scared and terrified" and "kept it honest at the end." The Defendant was lying when he told Detective Ulrey that he knew Hoovers and Crips would be at the party, but the Defendant was being truthful when he told Detective Ulrey that someone was outside the apartment and that he felt threatened. The Defendant did not intend to harm Mr. Wilkerson.

On cross-examination, the Defendant denied being a gang member, that J.F. was a Piru, or that the Defendant and J.F. talked about J.F.'s testimony. The Defendant said he did not have a gun in his hand when he got out of the car but acknowledged shooting seven times into an apartment full of people. The Defendant said that he was not thinking and

that he was not aiming the gun. He said that he did not intend to shoot the door and that he did not intend to kill anyone. On redirect examination, the Defendant acknowledged that "somebody crept around a dark corner," that he thought the person was going to kill him, and that he had to make a "split-second decision."

At the conclusion of the Defendant's testimony, the jury convicted him as charged of second degree murder, a Class A felony, in count one; attempted second degree murder, a Class B felony, in counts three and six; aggravated assault by use of a deadly weapon, a Class C felony, in counts four and seven; possession of a firearm with the intent to go armed during the commission of a dangerous felony, a Class D felony, in counts five and eight; and reckless endangerment by discharging a firearm into an occupied habitation, a Class C felony, in count nine. After a sentencing hearing, the trial court sentenced him to twenty years for the conviction of second degree murder, ten years for each conviction of attempted second degree murder, four years for each conviction of aggravated assault by use of a deadly weapon, three years for each conviction of possession of a firearm with the intent to go armed during the commission of a dangerous felony, and four years for the conviction of reckless endangerment. The trial court ordered that the Defendant serve the three-year sentences in counts five and eight concurrently with each other but consecutive to the twenty-year sentence in count one for a total effective sentence of twenty-three years in confinement.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his conviction of second degree murder, that the trial court erred by denying his motion for judgment of acquittal at the close of the State's proof, and that the trial court erred by denying his motion for new trial. The Defendant acknowledges that the evidence shows he acted recklessly when he shot into the apartment but contends that the proof fails to show he knew his conduct would result in a bullet penetrating the metal doors and killing Mr. Wilkerson. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

- 10 -

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Moreover, "once the trial court approves the verdict as the thirteenth juror and imposes judgment," our appellate review is limited to determining the sufficiency of the evidence. *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993); *see* Tenn. R. Crim. P. 33(d).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result-of-conduct offense. *See State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Taken in the light most favorable to the State, the evidence shows that the Defendant and J.F. drove to Ms. Gross's apartment and that the Defendant, who was affiliated with the Pirus or Bloods, knew rival gang members from the Deuces and Hoovers would be there for a party. The Defendant shot into the apartment door seven times, striking the couch on which Mr. Wilkerson was sitting, and fled the scene. The Defendant later gave a statement to Detective Ulrey in which he said that Ms. Gross's brother, who was a member of the Hoovers, "mean mouthed" him prior to the shooting and that he thought Ms. Gross's brother would be at the party. The Defendant acknowledged at trial that he shot multiple times into the apartment and that he knew the apartment was full of people. The Defendant claimed that he acted in self-defense, and the record reflects that the trial court instructed the jury on self-defense. However, given testimony from witnesses that

the Defendant was the only person outside the apartment at the time of the shooting, that no one inside the apartment was armed, and that no one physically or verbally threatened the Defendant, a reasonable jury could have rejected his self-defense claim and could have concluded that he acted knowingly when he shot seven times into an apartment with rival gang members inside. Accordingly, we conclude that the evidence is sufficient to support his conviction of second degree murder.

## II. Motion to Suppress

Next, the Defendant claims that the trial court erred by denying his motion to suppress his statement to police. The State argues that the trial court properly denied his motion. We agree with the State.

Before trial, the Defendant filed a motion to suppress his statement to Detective Ulrey, contending that the detective violated his Sixth Amendment right to counsel by interviewing him without his attorney present. At a pretrial hearing on the motion, Detective Ulrey testified for the State that the Defendant was "booked" into jail on November 12, 2017, and arraigned the next day. After the Defendant's arraignment, his mother "came to see" the detective. The Defendant's mother "expressed" that the Defendant was not involved in the shooting and that he wanted to give his version of what happened. Detective Ulrey told her that he was "perfectly fine with that." The Defendant's mother left and talked with the Defendant. She then telephoned Detective Ulrey and told him that the Defendant wanted the detective "to come get him." On November 14, Detective Ulrey had the Defendant transported to his office.

Detective Ulrey testified that he read *Miranda* warnings to the Defendant and "made sure" the Defendant understood the warnings. The Defendant gave two versions of the shooting. In the first version, the Defendant stated as follows: A "beef was going on" between the Bloods and the Hoovers. The Defendant was not a member of the Bloods but was "'affiliated'" with them. On the day of the shooting, the Defendant "ran into" a Hoover who was "mean mugging him." The Defendant later found out that the birthday party at Ms. Gross's apartment was a Hoover party. The Defendant, who did not have a gun, went to the apartment to get a bottle of liquor. While he was there, a Hoover crouched behind him and shot at him eight times, causing Mr. Wilkerson's death and M.P.'s injuries. Detective Ulrey did not believe the Defendant and confronted him with the physical evidence. The Defendant then gave his second version of the shooting. In the second version, the Defendant admitted having a gun, said that a Hoover started to pull a gun on him, and said that he shot at the Hoover eight times. Detective Ulrey told the Defendant that he did not think someone was outside Ms. Gross's door at the time of the shooting, but the Defendant maintained that a Hoover was in front of the door. The Defendant gave "locations" for the gun, but the police never found the weapon. The Defendant later

claimed he gave the gun to someone. Detective Ulrey said that he provided food from McDonalds and water to the Defendant during the interview.

On cross-examination, Detective Ulrey identified the Defendant's arrest warrant, which was issued on November 12, 2017. Detective Ulrey testified that at the outset of the Defendant's interview, the Defendant asked about the death penalty and the charge against him. Detective Ulrey told the Defendant that he was charged with "criminal homicide." Although "criminal homicide" was not a crime in Tennessee, the Defendant understood he was charged with murder. Detective Ulrey proceeded to advise the Defendant of his *Miranda* warnings. Detective Ulrey said that while doing so, the Defendant asked, "'Does it make a difference about a lawyer?'" Detective Ulrey stated, "I didn't really understand exactly what he was saying, so I continued on with our Miranda Warnings." Detective Ulrey told the Defendant that he wanted the Defendant to understand the *Miranda* rights, and the Defendant signed a waiver of rights form. Detective Ulrey acknowledged telling the Defendant that "'[y]ou would be better off telling me you carry a gun just because you need protection and somebody threatened you'" and that "[I] send people to prison for life for a living." Defense counsel asked if Detective Ulrey "broke" the Defendant, and Detective Ulrey answered, "[W]e had a good conversation the entire time."

Detective Ulrey acknowledged that the Defendant was eighteen years old at the time of the interview and said that the Defendant was crying toward the end of the interview. Detective Ulrey also acknowledged that the police used deception during suspect interviews and said that he was deceptive during the Defendant's interview by pretending to believe certain parts of the Defendant's statement. For example, Detective Ulrey told the Defendant that he thought Mr. Wilkerson was killed accidentally when Detective Ulrey actually thought the Defendant intentionally shot the apartment door.

On redirect-examination, Detective Ulrey testified that the Defendant had an attorney at the time of the interview and that one of the Defendant's rights advised him that his attorney could be present. On recross-examination, Detective Ulrey acknowledged that he did not try to contact the Defendant's attorney.

The trial court found that the Defendant was an adult and initiated the meeting with Detective Ulrey; that the Defendant was advised of his *Miranda* rights, including his right to counsel; and that the Defendant knowingly and voluntarily waived his rights. The trial court denied the Defendant's motion to suppress. On appeal, the Defendant does not contest that he made a knowing, intelligent, and voluntary waiver of his *Miranda* rights but asserts that the trial court erred in denying the motion because Detective Ulrey violated his Sixth Amendment right to counsel by interviewing him without his attorney present.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23.

The Sixth Amendment guarantees the accused, after the initiation of formal charges, the right to rely on counsel as a medium between himself and the State. *Maine v. Moulton*, 474 U.S. 159, 176 (1985). "In Tennessee, the Sixth Amendment right to counsel attaches with the initiation of criminal charges through an arrest warrant, a preliminary hearing (if no arrest warrant is issued), or an indictment or presentment (when the charge is initiated by the grand jury)." *State v. Turner*, 305 S.W.3d 508, 516 (Tenn. 2010) (citing *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980)). If adversarial proceedings have begun, the accused may not be subjected to further interrogation by government authorities until counsel has been made available to him, unless the accused himself initiates further communication. *See Michigan v. Jackson*, 475 U.S. 625, 636 (1986).

Turning to the instant case, the trial court accredited Detective Ulrey's testimony that the Defendant's mother, at the Defendant's request, reached out to him about a meeting and that the Defendant wanted to meet with him to give the Defendant's version of the shooting. Accordingly, the trial court found that the Defendant initiated the communication with the officer and denied the motion to suppress. Neither the Defendant nor his mother testified at the hearing to dispute Detective Ulrey's testimony. Accordingly, the evidence does not preponderate against the finding of the trial court, and the Defendant is not entitled to relief on this issue.

## III. Rule 404(b)

Finally, the Defendant claims that the trial court erred by allowing the jury to hear about his gang affiliation in violation of Tennessee Rule of Evidence 404(b) because the State failed to present any proof that he was an actual gang member and because "there was no alleged motive where gang affiliation was helpful to the trier of fact." The State claims that the trial court properly admitted the evidence. We agree with the State.

Before trial, the State filed a "Rule 404(b) Notice," advising the Defendant that the State was going to introduce testimony about his gang affiliation because it related to his

motive and intent. After Detective Ulrey testified at the hearing on the Defendant's motion to suppress, the State addressed its Rule 404(b) motion. The State argued that evidence about the Defendant's gang affiliation was relevant to his motive and intent to shoot into the apartment door because the Defendant said in his interview with Detective Ulrey that he was "affiliated" with the Bloods and that the shooting related to an earlier incident in which a member of the rival Hoover gang "mean mugg[ed]" him. The trial court found it "abundantly clear" that one of the motives for the shooting related to rival gang affiliations and, therefore, that the Defendant's affiliation with the Pirus or Bloods was relevant to the State's case. The trial court noted that the evidence was prejudicial but concluded that it was admissible. Addressing the issue at the motion for new trial hearing, the trial court stated as follows:

> As it relates to the issue of gang affiliation, counsel is correct. Normally, that type of evidence does not come in. In this instance a 404(B) hearing was conducted.

> There was, if I recall correctly, evidence that the Defendant was a member of a gang and that the group of the individuals present in the residence that there were other gang members there that were not of the same gang.

> And it had to do with the motive or the actions of the Defendant. And the Court made that determination that the probative value -- that there was clear and convincing evidence sufficient to -- for the Court to find that the probative value outweighed the prejudicial effect.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); *State v. Wyrick*, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

Here, the State's theory of the case was that the Defendant, who was affiliated with the Pirus or Bloods, shot into the apartment door because he knew members of the rival Hoover gang were inside the apartment. As noted by the State, this court has "repeatedly" held that evidence of a defendant's gang affiliation may be admissible for non-propensity issues such as motive. *State v. Sims*, No. E2018-01268-CCA-R3-CD, 2020 WL 5088737, at *9 (Tenn. Crim. App. Aug. 28, 2020). The trial court complied with the procedures set out in Tennessee Rule of Evidence 404(b) and correctly determined that the evidence was relevant to motive. Therefore, the trial court did not err by ruling the evidence was admissible.

## CONCLUSION

Upon our review, we affirm the Defendant's convictions. However, the judgment of conviction for count nine, reckless endangerment, reflects that the offense is a Class E felony. As charged and convicted in this case, reckless endangerment by discharging a firearm into an occupied habitation is a Class C felony pursuant to Tennessee Code Annotated section 39-13-103(b)(3), and the sentencing hearing transcript confirms that the trial court sentenced the Defendant for Class C felony reckless endangerment. Therefore, the case is remanded to the trial court for correction of the judgment.

_____
JOHN W. CAMPBELL, SR., JUDGE